**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) ) | **REDACTED** |
| v. | ) ) | No. 2:12-cr-20160-JPM |
| CHRISTOPHER TOMLINSON, | ) ) | |
|     Defendant. | ) ) | |

**ORDER FINDING NO <u>BATSON</u> VIOLATION**

Before the Court is the Mandate of the Sixth Circuit as to its disposition rendered on August 20, 2014. (ECF No. 89.) The Sixth Circuit instructed this Court to "hold a <u>Batson</u> hearing and make findings on whether Tomlinson established the existence of purposeful race discrimination in the selection of his jury that warrants reversal of his conviction." <u>United States v. Tomlinson</u>, 764 F.3d 535, 539 (6th Cir. 2014). For the reasons stated below, the Court finds that Tomlinson has failed to establish the existence of purposeful race discrimination.

**I.    BACKGROUND**

    **A.    Procedural Background**

A federal grand jury returned an indictment charging Defendant Tomlinson with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g) on June 26, 2012. (ECF No. 2.) Tomlinson elected to go to trial, which commenced on January 22, 2013. (<u>See</u> ECF No. 45.) During voir

dire, there were four rounds of peremptory challenges before the jury was empaneled. (ECF No. 75 at 172-173, 225-26, 275, and 288.) The Government used three strikes and the defendant used five strikes in the first round. (Id. at 173.) During the second round of strikes, the Government did not use any of its strikes and the defendant used four more strikes. (Id. at 226.) The third round consisted of two strikes by the Government and one strike by Defendant. (Id. at 275.) Finally, each side used one strike in the fourth and final round. (Id. at 288.) Tomlinson then made a Batson objection as to the Government's final strike as well as its previous strikes, stating, "I think all of the strikes by the Government were African-Americans, and this last one is also an African-American." (Id.) The Court found that the Batson objections as to the Government's first five strikes had been waived, and overruled Defendant's objection as to the final strike. (See id. at 294-98.) The final composition of the jury included seven black jurors, two of whom served as alternates. The jury convicted Tomlinson on January 25, 2013. (ECF No. 57.)

Tomlinson appealed his conviction on May 8, 2013. (ECF No. 66.) The Sixth Circuit reversed this Court's ruling that Tomlinson had waived his right to bring Batson challenges with respect to the Government's first five peremptory strikes. 764 F.3d at 536.

The Government filed its <u>Batson</u> brief in this Court in light of the Sixth Circuit's ruling on December 9, 2014. (ECF No. 92.) Tomlinson filed his responsive briefing on January 27, 2015, and moved the Court to vacate his conviction. (ECF No. 99.)

The Court held three hearings to reconsider the Government's peremptory challenges in light of the Sixth Circuit's opinion. (ECF Nos. 96, 102, and 104.)

### B. Factual Background

#### 1. The First Round of Jurors

The jury panel entered the courtroom for voir dire in the trial of Christopher Tomlinson at 9:37 a.m. on January 22, 2013. (Voir Dire Tr. 3, ECF No. 75 (sealed).) Fourteen jurors were initially called: [Juror #1], [Juror #2], [Juror #3], [Juror #4], [Juror #5], [Juror #6], [Juror #7], [Juror #8], [Juror #9], [Juror #10], [Juror #11], [Juror #12], [Juror #13], and [Juror #14].

The Court asked two questions, which each juror was asked to answer with a different response than each juror before. (<u>See</u> <u>id.</u> at 3–22.) Each juror was able to hear each prior juror's response, which also provided every juror an opportunity to learn as voir dire proceeded. The Court's questions were: (1) "[W]hat do you think is the most important characteristic for a person who is going to serve on the jury[?]" (<u>id.</u> at 4);

and (2) "What is an example of a characteristic as to which people sometimes have a bias or prejudice?" (<u>id.</u> at 10).  Each juror's answer is summarized in the tables below:

| | (1) **What do you think is the most important characteristic for a person who is going to serve on the jury?** |
|---|---|
| **[Juror #1]** | "Probably honesty." (<u>Id.</u> at 5.) |
| **[Juror #2]** | "Paying attention."  (<u>Id.</u>) |
| **[Juror #3]** | "Fairly."  (<u>Id.</u>)  The Court responded: "To act fairly, I wasn't quite sure I heard you.  Absolutely, we have to be fair.  I'm just going to use that word."  (<u>Id.</u>) |
| **[Juror #4]** | "Stay focused."  (<u>Id.</u>) |
| **[Juror #5]** | "Integrity"  (<u>Id.</u>) |
| **[Juror #6]** | "I would say unbiased."  (<u>Id.</u>) |
| **[Juror #7]** | "Truthful."  (<u>Id.</u>) |
| **[Juror #8]** | "Trust your instinct. . . .  Based on the video we watched in the room, one of the people that gave a testimony said that you have to trust gut, and so . . . ."  (<u>Id.</u> at 6.)  After some discussion with the Court, [Juror #8] agreed that objectivity was more important than subjective gut feelings.  (<u>See</u> <u>id.</u> at 7-8.) |
| **[Juror #9]** | "Similar to unbiased would be open-minded."  (<u>Id.</u> at 8.) |
| **[Juror #10]** | "Punctual. . . .  Be on time."  (<u>Id.</u> at 8-9.) |
| **[Juror #11]** | "It is getting harder.  I'm going to go with appreciate the system."  (<u>Id.</u> at 9.) |
| **[Juror #12]** | "Someone that looks at all the evidence."  (<u>Id.</u>) |
| **[Juror #13]** | "Reason."  (<u>Id.</u>) |
| **[Juror #14]** | "Don't let prejudice get in your way."  (<u>Id.</u>) |

| | **(2) What is an example of a characteristic as to which people sometimes have a bias or prejudice?** |
|---|---|
| **[Juror #1]** | "Gender."  (Id. at 10.) |
| **[Juror #2]** | "Family member."  (Id.)  The Court then asked [Juror #2] whether he meant that a personal relationship may make a person biased.  (Id. at 10-11.)  [Juror #2] agreed that is what he meant.  (Id. at 11.) |
| **[Juror #3]** | "I'm going to go with what they bring to the table, they bring to the table, a person's character."  (Id. at 11.)  The Court responded: "Okay.  Well, that can be something as to which people -- I just wouldn't know -- let's be a little more specific."  (Id.)  [Juror #3] responded: "Positively like."  (Id.)  Because [Juror #3] appeared to be struggling to grasp the concept, the Court suggested that someone's "hair color or lack of hair or facial hair" might be something about which a person could be biased.  (Id. at 12-14.)  [Juror #3] agreed.  (See id.) |
| **[Juror #4]** | "Age."  (Id. at 14.) |
| **[Juror #5]** | "A person's demeanor."  (Id. at 16.) |
| **[Juror #6]** | "I would say somebody's weight."  (Id.) |
| **[Juror #7]** | "Say, handicap."  (Id.) |
| **[Juror #8]** | "I would say race."  (Id. at 17.) |
| **[Juror #9]** | "I would say previous history or criminal record."  (Id.) |
| **[Juror #10]** | "I would say where the person was born . . . ."  (Id. at 18.) |
| **[Juror #11]** | [Juror #11] did not answer the question, but explained, in response to questioning from the Court following on [Juror #10]'s answer, that her mother was a Ukrainian immigrant who was fluent in six languages and had been discriminated against because of where she was from.  (See id. at 19-21.) |
| **[Juror #12]** | "Sometimes the way they're dressed."  (Id. at 21.) |
| **[Juror #13]** | "Generation. . . .  Well, somebody doesn't like yuppies, gen Xers, [gen Yers], you name it."  (Id. at 22.) |
| **[Juror #14]** | "Religious preference."  (Id. at 22.) |

Next, the Court asked each juror whether he or she could "make a decision in this case without being influenced by any of these illegal or unconstitutional factors." (Id. at 24.) Every juror responded affirmatively. (Id. at 24-26.)

The Court then asked one juror each to identify: "the lawyer bringing the claim" (id. at 27), "the lawyer defending the claim" (id.), "the person who you think is the defendant" (id.), and "the U. S. representative" (id. at 28).  Once the jurors had selected which person had each role,[1] the Court asked a series of eleven follow-up questions.

First, the Court asked [Juror #5] "what was fundamentally wrong" with the way the jurors had used to pick out people -- "What did they use as a way to pick out people?"  (Id. at 30.) [Juror #5] responded, "Appearance."  (Id.)  [Juror #5] then acknowledged that appearance is not an attribute that he would "want to rely on in making important decisions in [his] life." (Id. at 31.)  [Juror #5] explained that in order to avoid making a decision influenced by an inappropriate factor, "[y]ou have to listen to the evidence."  (Id.)

Second, the Court then asked [Juror #6] what he thought when [Juror #1] was asked "to pick out somebody."  (Id.) [Juror #6] responded: "I thought I knew the answer, but to answer your question, I guess you are doing an exercise, so I figured you wanted to show a thing about, I guess, bias or judgment or appearance on that."  (Id. at 31–32.)

Third, the Court asked [Juror #7] how he thought "Mr. Tomlinson felt when he got picked out as the defendant."

[1] The jurors "got one out of four [correct], . . . 25 percent."  (Voir Dire Tr. 29.)

(Id. at 33.) [Juror #7] responded, "Well, I think he felt --
yeah, I guess the look in his face that I'm the one, I'm
guilty." (Id.) The Court then noted, "Hopefully, we haven't
decided that yet." (Id. at 34.) [Juror #7] responded, "He was
just -- I guess that's how she was looking at him or he was
looking at her, the reason she picked him." (Id.) [Juror #7]
then acknowledged that Tomlinson was the youngest person to pick
from, and is an African-American male. (Id.) The Court then
asked [Juror #7]:

> Would you feel concerned that the jury was going to
> judge you based on unconstitutional factors if you got
> picked out?
>
> A. Yes.
>
> Q. Okay. How do we tell Mr. Tomlinson that that is
> not going to happen, what do we tell him.
>
> Q. I say look at the case, the evidence and just --
> I guess just look at everything and listen, that way
> we'll find out.
>
> Q. Just look at the evidence, I kind of --
>
> A. Well --
>
> Q. No, that's fine, that's okay. In other words,
> I'm not going to look at those unconstitutional
> factors, right?
>
> A. Yes, yes.

(Id. at 34-35.)

Fourth, the Court asked [Juror #8] why he thought the
exercise had been performed. (Id. at 35-36.) [Juror #8]
responded, "I believe it is bring [sic] to an awareness how

often we do prejudge and make decisions based on something that's not." (Id. at 36.)

Fifth, the Court turned to [Juror #9], who stated that he works in the school system and as a pastor. (Id. at 37.) The Court asked [Juror #9], "What makes a jury different from people making independent individual decisions?" (Id.) [Juror #9] responded, "We have to work together as a group and come to a consensus." (Id.)

Sixth, the Court followed up with [Juror #10] and asked her, "[W]hat else is different about a jury than an individual decision or maybe snap judgment when we might walk into the grocery store?" (Id.) [Juror #10] responded, "I think individual decisions, even though unintentional, still could be somewhat biased, but when you're with a group of people that all have their own different beliefs and everything, I think they can reach the most unbiased opinion together." (Id.)

Seventh, the Court asked [Juror #11] whether anybody on the jury "should have more say about what the decision of the jury is than perhaps other people on the jury? Does anybody's status make any difference on the jury." (Id. at 38.) [Juror #11] responded, "I don't think it should make a difference." (Id.) As to judging witness credibility, [Juror #11] stated, "I think you just have to listen to each witness and see what they're

saying, what they do is not part of their experience with the case necessarily." (Id. at 39.)

Eighth, the Court followed up with [Juror #12], and asked whether a witness ought to be judged as more or less believable just because of their profession. (Id. at 40.) [Juror #12] responded, "No, I don't think you ought to just believe them just because of their profession." (Id.)

Ninth, the Court asked [Juror #13] what he thought when he realized the defendant had been correctly picked out. (Id. at 42.) [Juror #13] responded, "It was a loaded question." (Id.) [Juror #13] followed up that Tomlinson must have felt like it "[w]asn't his lucky day." (Id.)

Tenth, the Court asked [Juror #14] whether he would have felt uncomfortable if he had been picked out like Tomlinson:

A.   I think so.

Q.   I think you probably would.

A.   But that's who I would have picked out just by process of elimination just looking at them.

Q.   Right.  It's – it's one of those things, though, where it would make you uncomfortable.  You know, I asked earlier what do we tell Mr. Tomlinson to make him comfortable that he will -- that no unconstitutional factor will be used against him, what would you tell him?

A.   Well, he should feel, you know, that the people on the jury are going to be unbiased and go straight by the evidence, but I don't think that always happens.

(Id. at 44.)

Finally, the Court asked each juror who had picked a person's role to explain his or her decision.  [Juror #1] explained that she had made her choice because the woman she selected "just has that lawyer look. . . .  She was always taking notes, always paying attention, and always really trying to see what she needed to remember."  (<u>Id.</u> at 46.)  [Juror #2] stated that he "was just actually being open-minded about it, and I went off of just instincts, I guess, by looking because I didn't have any anything to really go on."  (<u>Id.</u> at 47.)  [Juror #3] -- who had correctly selected the defendant -- explained her decision:

> he was the youngest one up there and not saying he doesn't look professional or anything, but I just thought he was the one that was --
>
> Q.   He is young, and he is probably going to take that as a compliment, he's a young guy, but you see how that might have made him feel really bad?
>
> A.   Yeah, in a bad position.

(<u>Id.</u> at 48.)  [Juror #4] explained how she had made her choice:

> Basically because I was watching her, she -- like the other lady was taking notes and stuff, and she was really focusing on what we were saying up here, and she would look up every so often to see who was talking, but she was focusing on what she was doing, and she just --
>
> Q.   So that was just -- and you didn't have a lot to work with, right?
>
> A. No.

(<u>Id.</u> at 50.)

The Court then read the charge contained in the indictment to the jury -- that "[o]n or about March 21, 2012, in the Western district of Tennessee, Christopher Tomlinson, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year did knowingly possess in and affecting interstate commerce, a firearm, that is that Marlin .35 caliber rifle, in violation of Title 18, United States Code, Section 922(g)(1)." (Id. at 52.) Further, the Court explained that Tomlinson had stipulated that he was a convicted felon on or prior to March 21, 2012. (Id. at 53.)

The jurors were then asked whether anything about the nature of the case might affect their ability to sit on the jury and be fair and impartial, including whether they had close friends or relatives in law enforcement, whether they had firearms in the household, and whether they had strong feelings about gun possession -- either positive or negative. (See id. at 57-71.) Several jurors made statements that indicated further follow-up at sidebar was appropriate. (See id.) The only juror who stated that she might not be able to decide the case fairly and impartially, however, was [Juror #11]. (Id. at 67.)

After a brief recess, the Court held sidebar conversations with [Juror #6], [Juror #7], [Juror #11], [Juror #12], and [Juror #14]. (Id. at 76-111.) At sidebar, [Juror #6] explained

that his son had been involved in an incident with a firearm that resulted in charges being brought against him.  (Id. at 76-78.)  [Juror #6] stated that his son was put in pre-trial diversion, and that he had since been doing well.  (Id. at 78.)  Despite this situation, [Juror #6] stated that he believed he could keep an open mind and decide the case impartially.  (See id. at 84-86.)  During sidebar, [Juror #6] also acknowledged that he knows a brother of one of Tomlinson's attorneys.  (Id. at 87-88.)

[Juror #7] stated at sidebar: "To tell you the truth, I think I wouldn't be right on the jury."  (Id. at 89.)  According to [Juror #7], his son's mother had been shot and killed in Memphis in 2004.  (Id. at 89-90.)  Without objection, the Court excused [Juror #7].  (Id. at 91.)

The next sidebar held was with [Juror #11], an elementary school principal.  (Id. at 92-94.)  [Juror #11] stated:

> Okay.  Well, first of all, I thought I could be impartial, but hearing that someone who has been convicted of a crime and it's against the law for them to be in possession of a firearm, and then to cross a state line, I feel like if someone has been convicted, they have been educated that that is not something they can do.

(Id. at 92.)  The Court explained that "the defense position may be that he didn't possess the gun."  (Id. at 92.)  [Juror #11] responded, "I absolutely think that's probably the case that the defense would make, but I'm feeling very much against him."

(Id. at 93.)  Following some additional questions, [Juror #11] was excluded for cause.  (Id. at 102.)

[Juror #12] was called next for a sidebar conversation. (Id. at 103.)  [Juror #12] explained that her brother had, approximately four years prior, fired at a man that was trying to break into his vehicle.  (Id. at 104.)  The Court asked [Juror #12] whether the incident would affect her thoughts in this case.  (Id.)  [Juror #12] responded, "Not really, I don't think."  (Id.)  [Juror #12] also noted that her father was a retired FBI agent.  (Id.)

The final sidebar before additional jurors were called was with [Juror #14].  (Id. at 105.)  According to [Juror #14], he was the victim of three burglaries of his home.  (Id. at 106.) All three involved guns.  (Id.)  [Juror #14] was home when two of the burglaries occurred.  (Id. at 106.)  One burglary occurred in Fremont, California, and two occurred in Mason, Tennessee.  (Id.)  [Juror #14] recounted what occurred in the Fremont, California burglary:

> Well, they caught the guy, there was three of them in my house, and they caught them all.  One of them had a gun.  I had a gun, I fired at him, he fired at me. Lucky, neither one of us got hit, but it was a bad scene because his family came after me because he went to jail and, you know, it -- his brother got up in court because I was testifying and told the judge, says, you know, I don't care what you're giving him, I'm going to kill him as soon as I can.  So I had a policeman in my driveway from 4:00 o'clock at night

> until 8:00 o'clock in the morning, but for 30 days,
> until they finally got the guy . . . .

(Id. at 106–07.)  [Juror #14] then testified as to the details

of the other two burglaries.  (Id. at 107–09.)  [Juror #14]

stated that the burglaries were not his main concern:

> I guess the main issue I would have in this case would
> be felon with a firearm because we have a convicted
> felon in our church.  I do have a gun carry permit,
> and I had my gun laid on the dash of my van, and he
> needed a ride home, and so I told him I would take him
> home.  I didn't think anything about it.  He went to
> get in the truck, and he said you can't take me. . . .
> So I –– you know, I thoroughly believe they know the
> law that they have breached. . . .  I would just say
> that, truthfully, it would take more for the defense
> to convince me than it would the prosecution.

(Id. at 109.)  Upon an unopposed motion from the defense,

[Juror #14] was struck for cause.  (Id. at 110.)

### 2.    Second Round of Jurors

Three additional jurors were then called to replace the

excluded jurors: [Juror #15], [Juror #16], and [Juror #17].

(Id. at 112.)  Both [Juror #15] and [Juror #16] indicated that

they needed to have side bar conversations.  (Id.)

[Juror #15] stated in sidebar that she had "a family full

of military people and law enforcement people," and that she

"had a cousin that shot somebody and killed them.  So he's in

jail." (Id. at 115.)  [Juror #15] testified that despite her

experience with law enforcement and the experience with her

cousin, she did not think that those experiences would affect

14

the way that she viewed the testimony of law enforcement officers, either positively or negatively.  (Id. at 122.)

[Juror #16] was excused, without objection, because of a medical condition.  (Id. at 125.)  As a result, [Juror #18] was called to take [Juror #16]'s seat.  (Id. at 126.)  [Juror #18] testified at sidebar that she had been a sergeant in the United States Army.  (Id. at 128-29.)  She also stated that she was a member of the NRA, and that the day of voir dire was "the first day I haven't carried one in a long time."  (Id. at 130.)  The Court then asked [Juror #18] what she thought the most important characteristic was for someone who is going to be on the jury.  (Id. at 131.)  [Juror #18] responded: "The most important thing to me is impartial and unbiased, and you have to be open to the evidence, period."  (Id.)

[Juror #1] then asked for a sidebar.  (Id. at 133.)  The following colloquy took place:

Q.   How are you doing?

A.   I'm doing good.

Q.   What have you got?

A.   I don't know for sure, but the defendant looks very familiar to me.  I don't know where I know him from.  I don't want to --

. . .

Q.   Where do you think you might have seen Mr. Tomlinson?  You know, the fact that -- we all might see somebody and say they look familiar, the question

will be ultimately would that influence you at all.
But where do you think you might have seen him?

A.   Maybe -- I don't know if he's like maybe a friend
of the family or maybe a friend of a relative.  I may
have seen him at church. . . .  I keep looking at him
and say I know this guy from somewhere, I can't say
where.

(Id. at 133-36.)  [Juror #1] testified that if she remembered

how she knew Tomlinson at some point in the trial, it would not

affect her verdict.  (Id. at 138-40.)

[Juror #2] then came up for a sidebar conversation.  (Id.

at 140-43.)  He stated that his daughter is the payroll clerk

for the City of Memphis at the Binghamton Police Precinct and

discussed the implications of that fact.  (Id. at 140.)

The Court then asked [Juror #15], who as seated in seat

number 7 in the jury box,[2] what she thought the most important

characteristic is for someone who is going to serve on a jury.

[Juror #15] responded: "To listen and only go with the evidence

that you have before you."  (Id. at 143-44.)  The Court followed

up by asking why the role identification exercise was performed.

(Id. at 146.)  [Juror #15] responded that the purpose was to

help the jurors understand "[t]hat we can't make our decision by

looking at the people, we have to have the evidence before us."

(Id.)  [Juror #17] and [Juror #15] then confirmed that they

---

[2] The juror box seats a total of fourteen potential jurors.  The seats are
numbered 1 through 7 in the front row (with seat 1 closest to the bench and
the witness stand), and 8 through 14 in the second row (with seat 8 closest
to the witness stand).

could decide the case impartially and apply the law as instructed.  (Id. at 147–48.)

The Government then asked the jury questions in open Court.  (Id. at 148.)  The Court held a sidebar with [Juror #15] following the Government's question as to whether any juror "or a close family member" had been charged or convicted of a felony.  (Id. at 151.)  [Juror #15] stated that her husband had been convicted of a felony for transporting stolen tires.  (Id. at 151–52.)

[Juror #4] then came up to sidebar and stated that she had a cousin in jail in Memphis for shooting a police officer.  (Id. at 156.)  According to [Juror #4], nobody died, but both her cousin and the police officer were injured.  (Id. at 158.)  [Juror #4] testified that nothing about this incident would affect her judgment of the credibility of law enforcement officers.  (Id. at 160.)  [Juror #4] also noted that she is a minister, but that this would not affect her ability to render an impartial verdict.  (See id. at 162–64.)

Defense counsel then asked questions of the jury.  (Id. at 165.)

The Court then requested peremptory challenge sheets from each side.  (Id. at 172.)  The Government struck [Juror #1], [Juror #3], and [Juror #6].  (Id. at 173.)  The Defense struck

[Juror #18], [Juror #12], [Juror #13], and [Juror #17].[3]  (Id.)
No objections were made.  (Id.)

### 3.    Third Round of Jurors

Another set of jurors were called to replace the stricken jurors: [Juror #19], [Juror #20], [Juror #21], [Juror #22], [Juror #23], [Juror #24], and [Juror #25].[4]  The Court asked then some of the same preliminary questions to these jurors.  (Id. at 176–77.)

[Juror #19] stated that the most important characteristic for a juror is to be "open-minded."  (Id. at 176.)

[Juror #20] testified that a characteristic for which people sometimes have a bias or prejudice "could be over race or sex, any of those issues that we talked about today."  (Id. at 178.)

[Juror #21] testified that he had no problem with the kind of case that was being tried.  (Id. at 179.)  [Juror #21] also testified that he could not remember who was picked as a defendant in the role selection exercise.  (Id.)  When asked who he thought was the defendant, [Juror #21] selected Tomlinson. (Id.)

---

[3] Tomlinson also struck [Juror #3], but the strike was counted against the Government.  (Voir Dire Tr. 173.)
[4] These jurors were seated in seats 7, 9, 10, 11, 12, 13, and 14, the previously selected jurors having been re-seated in seats 1 through 6 and seat 8.  Seats 7 and 14 are the "alternate" juror seats.  See App'x A (a blank juror seating chart used by the Court).  The panel is generally only re-seated after peremptory challenges are made.

[Juror #23] remembered that the only person who was selected correctly was Tomlinson. (Id. at 179.) The Court asked [Juror #23] how she would have felt if she had been picked that way:

A.   Guilty.

Q.   You would have felt bad?

A.   Right, because they pointed me out in a line.

Q.   They were convicting you without a chance?

A.   Right.

(Id. at 180.) [Juror #23] noted that it was appropriate to consider all the evidence, but not Tomlinson's appearance, so that he would know that he was getting a fair trial. (Id.) [Juror #23] stated she would give him a fair trial. (Id.)

[Juror #22] testified that he thought the jury would decide the case fairly and impartially because they would pay attention. (Id. at 182.) He appeared to have some hearing problems, so he was called up for a sidebar conversation. (Id. at 185.) [Juror #22] stated that he had a 60 percent hearing loss. (Id.) When asked what he thought is the most important characteristic for someone who is going to sit on a jury, [Juror #22] responded, "To be able to hear." (Id. at 188.) With respect to an example of something that might be a basis for discrimination, [Juror #22] suggested, "Age." (Id. at 189.)

The Court then provided [Juror #22] with a hearing aid, which [Juror #22] confirmed helped him hear.  (Id. at 194-95.)

[Juror #24] then testified that the nature of the charges did not affect her ability to be fair and impartial.  (Id. at 196.)  She stated that there were guns in her house, but that she generally does not like firearms.  (Id. at 196-97.)  [Juror #24] also stated that her cousin is in law enforcement.  (Id. at 197.)  [Juror #24] testified that neither her feeling about guns nor her cousin's involvement in law enforcement would influence her decision.  (Id. at 196-98.)

[Juror #25] requested a sidebar.  (Id. at 199.)  [Juror #25] stated she had a family member incarcerated for second degree murder.  (Id. at 199-200.)  Her brother shot his fiancée multiple times, killing her instantly.  (Id. at 200.)  [Juror #25] testified that she did not think this is the kind of case she should sit on.  (Id. at 201.)  On motion and without objection, [Juror #25] was dismissed for cause.  (Id. at 201-02.)

[Juror #21] then requested a sidebar.  (Id. at 202.)  Due to financial hardship, [Juror #21] was excused without objection.  (Id. at 207.)

### 4. Fourth Round of Jurors

[Juror #26] and [Juror #27] were then called to replace [Juror #21] and [Juror #25].  (Id. at 208.)

[Juror #27] testified that he was in-house counsel for FedEx, and that he had never tried a criminal case. (Id. at 209.) He stated that there was no reason he could not serve on a jury. (Id. at 210.) [Juror #27] testified that the most important characteristic for someone to serve on a jury was impartiality. (Id.)

[Juror #26] testified that an example of a characteristic to which people sometimes have a bias or prejudice is sexual orientation. (Id. at 211.) [Juror #26] stated that the most important set of data to use to make her decision is "to listen to both sides, the evidence on both sides." (Id. at 212.) She further testified that she would not hold it against Tomlinson if he were to choose not to testify. (Id.)

The Court then asked [Juror #23], who was a paralegal, whether anything she did had anything to do with criminal law. (Id. at 214.) [Juror #23] responded, "More than likely I'm not going to be able to explain it to them unless it is about real estate law, so unless they want to ask me about a deed of trust or a warranty deed, I'm really not going to be able to help them." (Id.)

The Government then asked follow-up questions of the new jurors, including whether they had ever served on a jury. (Id. at 218-220.) [Juror #20] stated that he had served on a murder trial in which a guilty verdict was returned. (Id. at 219-20.)

Next, defense counsel asked follow-up questions of the new jurors. (Id. at 221-25.)

The Court then asked for peremptory challenge sheets from both sides to be filled out and handed up. (Id. at 225.) The Government made no strikes. (Id. at 226.) Tomlinson struck [Juror #27], [Juror #24], [Juror #23], and [Juror #20]. (Id.) The Government made no objections.[5] (Id.)

### 5. Fifth Round of Jurors

[Juror #28], [Juror #29], [Juror #30], and [Juror #31] were then called.[6] (Id. at 227.)

The Court asked [Juror #28] what the most important characteristic is for someone who is going to be on the jury. (Id. at 228.) The Court stated that "there's one we didn't list before, and you have had to wait a lot today, what is the most important characteristic, you have to be patient." (Id.) [Juror #28] responded, "That would be a good one. . . . Impartiality really even though it has been said." (Id.)

[Juror #29] responded to the same question: "Weight." (Id.)

[Juror #30] answered why she thought the role selection exercise was performed: "Well -- so well, I believe that -- so that all of us can be informed about how this process goes."

---

[5] [Juror #19], [Juror #26], and [Juror #22] were then seated in seats 9, 10, and 11, respectively.

[6] The new prospective jurors were seated in seats 7, 12, 13, and 14 respectively.

(Id. at 229.)  The Court then asked [Juror #30] what criteria
the exercise showed could not be used in judging people.  (Id.)
[Juror #30] responded, "Well, I mean their race, color."  (Id.)
The Court asked [Juror #30] where the evidence would come from
in the case.  (Id.at 231.)  [Juror #30] stated, "The evidence is
going to come from the facts that they present."  (Id. at 231.)

[Juror #31] requested a sidebar when she was first
addressed.  (Id. at 231.)  [Juror #31] was distraught and
testified at sidebar that a friend of her cousin's had been
killed over the weekend.  (Id. at 232.)  On the defense's
motion, and without objection from the government, [Juror #31]
was excused for cause.  (Id. at 233.)

[Juror #28] came to sidebar next.  (Id. at 234.)  He
testified that at the beginning of his career, he was a branch
manager for a bank, and was robbed three times.  (Id.)  In two
of the robberies, [Juror #28] was "hardly aware" that his branch
was being robbed, and was not sure until the robbers were out
the door.  (Id. at 234-35.)  As for the third robbery,
[Juror #28] stated that he set the alarm off under his desk, and
then discretely followed the robber out the door, got the
robber's license plate, and noted the direction he had gone.
(Id. at 235.)  [Juror #28] could not remember if the first
robber had been caught.  (Id.)  The latter two, though, "were
caught, they were drug using, and they were caught in a hotel

room." (Id.)  The latest robbery occurred in "probably 1975."

(Id.)  [Juror #28] testified that none of those incidents would

affect his decision in this case.  (Id. at 237.)  Defense

counsel asked if [Juror #28] had any experience with domestic

violence.  (Id. at 238.)  [Juror #28] responded that the

daughter of his friends "had to get out of an abusive

relationship, physically abusive relationship."  (Id. at 239.)

### 6.  Sixth Round of Jurors

[Juror #32] was called to replace [Juror #31].  (Id.)

[Juror #32] requested to speak at sidebar.  (Id. at 240.)

[Juror #32] notified the Court of two facts he thought were

important: (1) "Things -- if I talk to people one-on-one, I can

understand them a hundred percent, but if I hear a conversation,

I might miss some part" (id.); and (2) "another thing is that

right now I'm on diversion . . . [f]or felony assault"[7] (id. at

241).  [Juror #32] stated that English is his second language,

and Vietnamese is his first language.  (Id. at 242.)  He was

born in Bien Hoa, Vietnam in 1980, and moved to Memphis in 1991.

(Id. at 243.)  The Court asked [Juror #32], "if everyone speaks

in the way I'm speaking, will you be able to understand

everything."  (Id. at 244.)  [Juror #32] responded, "Yes, sir."

(Id.)  He stated that the most important characteristic for

someone on the jury was to "[l]ook at the details and use

---

[7] [Juror #32] later said he was in fact charged with simple assault.  (Voir
Dire Tr. 246.)

logical reasoning." (Id.) He acknowledged that he had been treated differently because English was his second language, and that it was a bad feeling when he was treated that way. (Id.) [Juror #32] stated that he had an "electrical engineer degree at Christian Brothers" and "a master in computer science at University of Memphis." (Id. at 250.) [Juror #32] then acknowledged that he was concerned that he might miss something important, and felt that it might not be appropriate for him to serve on the jury as a result. (Id. at 253.) On the Government's motion, and without objection, [Juror #32] was stricken for cause. (Id. at 254.)

### 7. Seventh Round of Jurors Called

[Juror #33] was then called. (Id. at 254.) She requested to speak at side bar. (Id.) Without objection, [Juror #33] was excused for health reasons. (Id. at 255.)

### 8. Eighth Round of Jurors Called

The next juror called was [Juror #34]. The Court asked [Juror #34], "What kind of jury do we have to have in order to meet the requirements of the Constitution?" (Id. at 256.) [Juror #34] responded, "A jury that is built on communication first and foremost, and a jury that is able to confidently state their ideas of what they felt from the other participants that have taken place with their evidence." (Id.) [Juror #34] acknowledged that a jury has to be unbiased. (Id. at 257.) As

to how Tomlinson must have felt when he was picked as the defendant during the role selection exercise, [Juror #34] stated: "Of course, he felt nervous and accused already . . . and assuming that maybe he did display something that she already preconceived about him." (Id. at 258.) The Court then asked [Juror #34] what "we tell Mr. Tomlinson to assure him that we will not use any unconstitutional factor against him." (Id.) [Juror #34] responded, "That there are no preconceived notions about you, and we will go on the evidence and hear both sides to make a common decision." (Id.)

The Government then asked questions of the new jurors. (Id. at 259.) [Juror #30] testified that she had served on a criminal jury thirty years ago in which the verdict had been guilty. (Id. at 260.)

[Juror #29] requested to speak at sidebar. (Id. at 265.) The following colloquy occurred:

Q. Yes, sir. What is going on? Tell us what happened.

A. From Westwood, I mean I know a lot of people that has been robbed and a lot of crimes, you know, I can't lie about that.

Q. No, I understand that. Well, the question partly, though, is while we might know somebody, anybody who has been close to you who has had conflict with the law?

A. Yeah.

Q. Tell me about that.

A.   I had a cousin that killed a guy, you know.

Q.   Well, that will usually get the attention of the authorities. What happened to his case?

A.   He robbed him and killed him.

Q.   How long ago was that?

A.   About eight, nine years ago.

Q.   Okay.  Did you -- were you close to this cousin?

A.   He stay across the street.

Q.   Stayed right across the street?

A.   Yes.

. . . .

Q.   Let me ask this: Have you yourself ever been in a situation where even though you weren't involved in the criminal conduct, you were stopped by the police and questioned?

A.   Yes, several times.

Q.   Okay.  And when is the -- what were those types of occasions?

A.   This year, I mean just stopped, just pulled over.

Q.   I understand.  And did you feel that was unjustified?

A.   Yeah.

(Id. at 266-68.)  [Juror #29] testified that despite these interactions with law enforcement, he would not consider the testimony of a law enforcement officer more positively or negatively than anyone else.  (Id. at 269-70.)

Defense counsel then asked follow-up questions of the new jurors.  (Id. at 271-74.)

27

The Court asked for peremptory challenge sheets from both sides, which were then handed up. (Id. at 275.) The Government struck [Juror #29] and [Juror #34]. (Id.) Tomlinson struck [Juror #30].[8] (Id.)

### 9. Ninth Round of Jurors Called

The next jurors called were [Juror #35], [Juror #36], and [Juror #37].[9] (Id. at 276.) [Juror #36] stated that he had family in law enforcement, and that he had been in the military for 19 years, including for some time as a weapons expert. (Id. at 277.) [Juror #36] stated that the most important characteristic for a person on the jury is "integrity." (Id. at 278.)

The Court questioned [Juror #37] next:

Q. I'm going to ask one question . . . . Do you remember when we did that exercise where it was [Juror #1] at the time, and she is not here anymore, [Juror #3] was here and so forth, and I asked them to identify -- to go out there and look and tell me who some people were?

A. Yes.

Q. What was the purpose of that exercise, why did we do it?

A. The purpose was for us not to just look and just at it, but it was so obvious, though, if I may say that so obvious that he was. From my perspective,

---

[8] [Juror #28] was moved to seat 12.
[9] The three new prospective jurors were seated in seats 7, 13, and 14, respectively.

because when I came in, the attorneys were up there
with you, he was sitting there.[10]

Q.    Okay.  That's a reason.

A.    To me, I already knew who he was.

Q.    You saw some objective information that would
allow --

A.    Right, when I first got here, right.  And he
didn't have a suit jacket on, and he was sitting there
by himself, so I wouldn't think he was one of the
attorneys.

Q.    But would you agree that it would be wrong --
what do we have to tell Mr. Tomlinson so that he will
know that we will decide this case fairly and
impartially, what do we have to tell them?

A.    That we do apologize, Mr. Tomlinson, that you
didn't have a jacket on today.  If you had had a
jacket on, could have threw the whole thing on, but
you didn't have a jacket on, and when I came in, every
attorney was up with the judge and you were sitting
there, so I knew who you was, I do apologize.

Q.    That's okay too.

A.    I apologize for them doing you like that.

Q.    The critical question there is, will you promise
all of us, including Mr. Tomlinson, that you will
decide the case solely on the evidence and the law and
not use any unconstitutional factors?

A.    Yes, yes, I promise you, babe.

Q.    If the government proves the case, the allegation
beyond a reasonable doubt, what verdict would you have
to return?

A.    It would be innocent.

Q.    No, if they prove it --

---

[10] In fact, [Juror #37] was not correct.  The attorney did not first approach
the sidebar until much later.  No other potential juror was confused about
this fact.

A.    If they prove it, if they prove it --

Q.    Then it would be guilty?

A.    It would be guilty.

(Id. at 278-80.)

The Court then questioned [Juror #35].  (Id. at 280.)
[Juror #35] was asked if the jury will be able to do its job in
this case.  (Id.)  [Juror #35] responded: "I believe I do. . . .
[W]e're going to base everything on the facts and be objective
and be impartial and weigh all the evidence and make the right
decision."  (Id.)  [Juror #35] further stated that there was
nothing about the nature of the charges that would affect his
ability to sit on the jury.  (Id. at 282.)

The Government then asked questions of the new jurors.
(Id. at 282.)  [Juror #36] stated that he had served on a
federal grand jury, and a local jury, in 1996 and 1998
respectively.  (Id. at 283.)  The Government then questioned
[Juror #37]:

> Q.    Okay.  Now, you made some promises to the
> defendant?
>
> A.    Yes.  Yeah, I promised you, baby, yeah.
>
> Q.    Let me ask you this on behalf of the United
> States, if the case is proven beyond a reasonable
> doubt, all the elements that Judge McCalla instructs
> must be found by the law and you find that the facts
> meet that, would it be difficult for you to return a
> verdict of guilty?
>
> A.    No.

(Id. at 284.)

Defense counsel then asked questions of the new jurors.
(Id. at 285.) [Juror #36] stated that he knows several people
that were in the military with him that currently work for the
Memphis Police Department. (Id.) He stated, however, that he
would not give a law enforcement officer more of the benefit of
the doubt than he would a lay person who is not a police
officer. (Id. at 286.) [Juror #36] stated that the verdict in
the state criminal trial case that he had served on was a guilty
verdict. (Id. at 287.)

Both sides then filled out their peremptory challenge
sheets. (Id. at 288.) [Juror #36] was struck by Tomlinson.
(Id.) [Juror #37] was struck by the Government. (Id.)
Tomlinson objected to the Government's strike: "I think we are
going to bring a Batson challenge. I think all of the strikes
by the government were African-Americans, and this last one is
also an African-American." (Id.) The Government articulated
its asserted reason for striking [Juror #37] on the record:

> [T]he race neutral reason that the United States
> struck [Juror #37] was the fact that she took the
> microphone, looked directly at the defendant called
> him baby on two occasions, and just the degree of
> familiarity with the defendant left us uncomfortable
> with her ability to return a verdict of guilty. . . .
> [T]he level of familiarity, and then also kind of the
> emphasis that she put on guilty versus not guilty
> . . . also left the United States uncomfortable with
> her ability to draw that line expressly where Your
> Honor placed it with the jury instructions.

(Id. at 290.)

**II. LEGAL STANDARD**

In Batson v. Kentucky, the Supreme Court held that an equal protection violation occurs when a prosecutor challenges a potential juror solely on account of her race. 476 U.S. 79, 89 (1986). "Engaging in racial discrimination during the exercise of peremptory challenges violates the equal protection rights of both the defendant and the challenged juror." United States v. Angel, 355 F.3d 462, 471 (6th Cir. 2004).

To determine whether such a violation has occurred, a court must engage in a "tripartite burden-shifting inquiry," Braxton v. Gansheimer, 561 F.3d 453, 458 (6th Cir. 2009) (citing Hernandez v. New York, 500 U.S. 352, 358 (1991)):

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Hernandez, 500 U.S. at 358–59 (internal citations omitted).

The prosecution's "reason for its decision to dismiss a juror is 'neutral' if 'it is based on something other than the race of the juror' and, absent 'discriminatory intent inherent in the explanation,' the reason should be deemed race-neutral." Braxton, 561 F.3d at 458. "This non-racial explanation need not

be particularly persuasive, or even plausible, so long as it is neutral." Id. at 458-59 (internal quotation marks omitted).

"[T]he critical question in determining whether a [defendant] has proved purposeful discrimination . . . is the persuasiveness of the prosecutor's justification for his peremptory strike." Id. at 459 (quoting Miller-El v. Cockrell, 537 U.S. 322, 338–39 (2003)). "In other words, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.'" Id. (quoting Miller-El, 537 U.S. at 339). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El, 537 U.S. at 339.

## III. ANALYSIS

Tomlinson challenges all of the Government's strikes because, he asserts, the pattern of strikes indicates that "the prosecution failed to select the jury 'pursuant to nondiscriminatory criteria.'" (ECF No. 99 at 16 (quoting Rice v. White, 660 F.3d 242, 258 (6th Cir. 2011).) The Court agrees with Defendant that a pattern of strikes against a particular race of jurors is evidence that a court should consider as part of its Batson analysis. Accordingly, the Court considers the

challenged peremptory strikes in light of the full pattern of strikes made by the Government during jury selection.

Tomlinson brings a _Batson_ challenge against four of the Government's six peremptory strikes, including the Government's sixth peremptory strike.[11]  (ECF No. 99 at 16 (conceding that "the reasons proffered by the prosecution for striking [Juror #6] and [Juror #34] are sufficiently race-neutral" and were not pretextual)).  Specifically, Tomlinson challenges the Government's strikes of [Juror #1], [Juror #3], [Juror #29], and [Juror #37].  Because all four were black, the first step of _Batson_ is satisfied.  With respect to the second step of _Batson_, Defendant does not contest that the Government's articulated justifications for [Juror #1], [Juror #3], and [Juror #37], are race-neutral.  (_See_ _id._ at 16–22.)  Consequently, the Court addresses only the third step of _Batson_ with respect to these three jurors.  For [Juror #29], however, the Court first addresses whether the Government's asserted justifications were race-neutral before considering Tomlinson's argument that it was pretextual.

For the following reasons, the Court finds no _Batson_ violation as to any of the Government's peremptory strikes.

---

[11] Defendant argues, however, that the fact that the other two peremptory strikes made by the government were also against black potential jurors is evidence of invidious discrimination.  (_See_ ECF No. 99 at 11–16.)

## A.  [Juror #1]

The Government articulates two reasons that it struck [Juror #1]: (1) "the uncertainty of how [Juror #1] knew the defendant"; and (2) "the complexity of how to deal with [Juror #1] discovering how she knew the defendant during the course of trial." (ECF No. 92 at 5.)  Tomlinson argues that the Government's articulated justifications are pretextual for two reasons: (1) that the Government's justifications are based on an inaccurate premise that [Juror #1] in fact knew the defendant; and (2) that, assuming [Juror #1] had seen Defendant at some point, "she was just as likely to have seen him under negative circumstances as under positive ones." (ECF No. 99 at 17.)

The Court finds that Tomlinson has not met his burden to show that the Government's strike of [Juror #1] was due to purposeful discrimination.  It was entirely reasonable for either side to be concerned about the possibility of prejudice arising during the case should [Juror #1] have determined that she did in fact have some connection to Tomlinson.  Based on the Court's recollection of the prosecutor's and [Juror #1]'s demeanors during voir dire, the reasonableness of the Government's justification, and in spite of the pattern of strikes against black jurors, the Court finds the Government's

justification to be credible.  Consequently, the Court finds no

Batson violation as to [Juror #1].

**B.    [Juror #3]**

The Government's articulated justifications for its strike
are that "she really didn't seem to grasp the purpose of voir
dire" and that "she didn't really seem to know or understand
what 'bias' meant."  (ECF No. 92 at 6.)  Tomlinson argues that
the Court should find the Government's justifications pretextual
for two reasons: (1) a lack of intelligence is a particularly
suspicious explanation for striking a juror (ECF No. 99 at 17
(citing McGahee v. Allen, 560 F.3d 1252, 1265 (11th Cir. 2009));
and (2) the prosecution tried to prevent a white juror from
being excluded for cause who Tomlinson argues appeared to have a
hard time understanding basic concepts (id. at 18).

The Court finds that Tomlinson has not met his burden to
demonstrate that [Juror #3]'s strike was pretextual.  The Court
had the opportunity to observe [Juror #3] closely and recalls
that she did not appear to understand either of the preliminary
questions asked.  Her lack of understanding relative to the
other jurors is apparent when her responses to the initial
questions are contrasted with the responses of her peers.

| | (1) What do you think is the most important characteristic for a person who is going to serve on the jury? |
|---|---|
| **[Juror #1]** | "Probably honesty." (<u>Id.</u> at 5.) |
| **[Juror #2]** | "Paying attention." (<u>Id.</u>) |
| **[Juror #3]** | "Fairly." (<u>Id.</u>) The Court responded: "To act fairly, I wasn't quite sure I heard you. Absolutely, we have to be fair. I'm just going to use that word." (<u>Id.</u>) |
| **[Juror #4]** | "Stay focused." (<u>Id.</u>) |
| **[Juror #5]** | "Integrity" (<u>Id.</u>) |
| **[Juror #6]** | "I would say unbiased." (<u>Id.</u>) |
| **[Juror #7]** | "Truthful." (<u>Id.</u>) |
| **[Juror #8]** | "Trust your instinct. . . . Based on the video we watched in the room, one of the people that gave a testimony said that you have to trust gut, and so . . . ." (<u>Id.</u> at 6.) After some discussion with the Court, [Juror #8] agreed that objectivity was more important than subjective gut feelings. (<u>See</u> <u>id.</u> at 7-8.) |
| **[Juror #9]** | "Similar to unbiased would be open-minded." (<u>Id.</u> at 8.) |
| **[Juror #10]** | "Punctual. . . . Be on time." (<u>Id.</u> at 8-9.) |
| **[Juror #11]** | "It is getting harder. I'm going to go with appreciate the system." (<u>Id.</u> at 9.) |
| **[Juror #12]** | "Someone that looks at all the evidence." (<u>Id.</u>) |
| **[Juror #13]** | "Reason." (<u>Id.</u>) |
| **[Juror #14]** | "Don't let prejudice get in your way." (<u>Id.</u>) |

In order to avoid embarrassing her, the Court interpreted her response to the first question to mean, "to act fairly." (<u>Id. at 5.</u>) From the context, however, it was clear that [Juror #3] struggled to make a meaningful response.

[Juror #3]'s lack of understanding became even more noticeable when the Court asked her to give an example of a characteristic about which some people are biased. Again, [Juror #3]'s response stood out:

| | **(2) What is an example of a characteristic as to which people sometimes have a bias or prejudice?** |
|---|---|
| **[Juror #1]** | "Gender."  (Id. at 10.) |
| **[Juror #2]** | "Family member."  (Id.)  The Court then asked [Juror #2] whether he meant that a personal relationship may make a person biased.  (Id. at 10-11.)  [Juror #2] agreed that is what he meant.  (Id. at 11.) |
| **[Juror #3]** | "I'm going to go with what they bring to the table, they bring to the table, a person's character."  (Id. at 11.)  The Court responded: "Okay.  Well, that can be something as to which people -- I just wouldn't know -- let's be a little more specific."  (Id.)  [Juror #3] responded: "Positively like."  (Id.)  Because [Juror #3] appeared to be struggling to grasp the concept, the Court suggested that someone's "hair color or lack of hair or facial hair" might be something about which a person could be biased.  (Id. at 12-14.)  [Juror #3] agreed.  (See id.) |
| **[Juror #4]** | "Age."  (Id. at 14.) |
| **[Juror #5]** | "A person's demeanor."  (Id. at 16.) |
| **[Juror #6]** | "I would say somebody's weight."  (Id.) |
| **[Juror #7]** | "Say, handicap."  (Id.) |
| **[Juror #8]** | "I would say race."  (Id. at 17.) |
| **[Juror #9]** | "I would say previous history or criminal record."  (Id.) |
| **[Juror #10]** | "I would say where the person was born . . . ."  (Id. at 18.) |
| **[Juror #11]** | [Juror #11] did not answer the question -- and was not asked -- but explained, in response to questioning from the Court following on [Juror #10]'s answer, that her mother was a Ukrainian immigrant who was fluent in six languages and had been discriminated against because of where she was from.  (See id. at 19-21.) |
| **[Juror #12]** | "Sometimes the way they're dressed."  (Id. at 21.) |
| **[Juror #13]** | "Generation. . . .  Well, somebody doesn't like yuppies, gen Xers, [gen Yers], you name it."  (Id. at 22.) |
| **[Juror #14]** | "Religious preference."  (Id. at 22.) |

Based on the Court's observations and the context, it was obvious that [Juror #3] was struggling to grasp the basic concept of the question.  (Id.)  No other juror struggled similarly.

Tomlinson's citations to McGahee, 560 F.3d 1252, are, in light of the foregoing, inapposite. McGahee involved a proffered justification of lack of intelligence to multiple jurors that was unsupported by the record. The McGahee Court therefore found that the state court should have considered in its third step of its Batson analysis that the prosecution had proffered an unsupported justification against multiple jurors that was "historically tied to racism." 560 F.3d at 1265. In this case, [Juror #3]'s lack of understanding is clearly supported by the record -- as well as by the Court's recollection. Additionally, the justification was only used against one juror. Despite the justification's problematic historical ties, the Court finds the Government's justification credible.

The Court finds Tomlinson's second argument similarly unavailing. Defendant points to the Government's "attempt to keep [Juror #11]" -- another juror -- as evidence of discriminatory intent. (ECF No. 99 at 18.) Tomlinson argues that [Juror #11] also struggled to understand the concept of bias. (Id.) Because [Juror #11] was white, and [Juror #3] was black, Defendant argues that the Government's justification must have been pretextual. (Id.)

The Government's stated justification, however, was not equally applicable to [Juror #11]. Whereas [Juror #3] appeared

to struggle to grasp what the concept of what bias meant at all, [Juror #11] did not struggle with the concept. In fact, [Juror #11] described a cogent example of bias: that her polyglot Ukrainian immigrant mother, who had been a medical student in Germany, had herself been discriminated against as a result of her national origin. (See Voir Dire Tr. 19-21.) Her ability to relate the concept of bias to an example in her own life demonstrated a high-level of understanding of the concept. Moreover, [Juror #11]'s description of her own bias against the Defendant indicated honesty -- not lack of understanding. (Id. at 92-93.) [Juror #11], an elementary school principal, stated that she was surprised at her own bias, but acknowledged that she felt "very much against" Tomlinson simply because he had previously been convicted of a felony. (Id.) Consequently, the justification asserted by the Government applied to [Juror #3] but not to [Juror #11].

In light of the record and the Court's recollection -- and in spite of the pattern of strikes used against black jurors -- the Court finds the justifications advanced by the Government to be credible and devoid of invidious discrimination. Consequently, the Court finds no Batson violation as to [Juror #3].

## C.    [Juror #29]

The Government asserts that it exercised a peremptory strike on [Juror #29] for two reasons: (1) "due to his close relationship with a cousin who was recently convicted of a crime of violence"; and (2) "because of his visible and express frustration with his history of being pulled over by law enforcement on multiple occasions for 'unjustified' reasons." (ECF No. 92 at 12.)  Tomlinson argues that the first reason advanced by the Government is not supported by the record.  (See ECF No. 99 at 18.)  As to the second reason asserted by the Government, Tomlinson argues that it is not in fact race-neutral and that it is pretextual.  (ECF No. 99 at 18–21.)  The Court addresses each of Tomlinson's arguments in turn.

The Government's first justification is supported by the record.  Tomlinson argues that "the crime committed by his cousin took place nearly a decade ago" and is therefore not "recent."  (Id. at 18.)  The Court finds that the conviction happened within such a time as to be described as "recent" in this context.  Tomlinson additionally argues that because "[Juror #29] expressly stated that he did not feel his cousin was treated unfairly by the justice system" (id. (emphasis in original)), the Government's justification is not supported by the record.  This argument misses the mark.  The Government's justification was based on a family member's relatively recent

41

conviction -- not based on any perception of unfairness. Accordingly, the Court finds that the Government's first asserted justification is supported by the record.

The Government's second asserted justification is race-neutral. Tomlinson's argument that this criterion disproportionately affects black male jurors is unavailing. The Supreme Court addressed this line of argument in <u>Hernandez</u>. According to the <u>Hernandez</u> Court, striking jurors on the basis of speaking both Spanish and English was race-neutral, despite the likelihood that such a justification could result in a highly disproportionate striking of Latino jurors. 500 U.S. at 360-63. Consequently, even if Tomlinson is correct that the Government's second asserted justification would have a disproportionate impact on black male jurors, that alone does not imply that the asserted justification is not race-neutral.

The Court also finds that the Government's second justification was not pretextual. According to the <u>Hernandez</u> Court, proving discriminatory purpose requires showing "that the decisionmaker selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." 500 U.S. at 360 (internal quotation marks and alterations omitted). "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact." <u>Id.</u> at 359-60.

42

Based on the Court's recollection of the prosecution's and [Juror #29]'s demeanors, and in spite of the pattern of strikes used and any potential for disparate impact of these particular justifications, the Court finds the Government's justifications credible. Accordingly, the Court finds no <u>Batson</u> violation as to [Juror #29].

### D.   [Juror #37]

The Government articulated its asserted reason for striking [Juror #37] on the record:

> [T]he race neutral reason that the United States struck [Juror #37] was the fact that she took the microphone, looked directly at the defendant called him baby on two occasions, and just the degree of familiarity with the defendant left us uncomfortable with her ability to return a verdict of guilty. . . . [T]he level of familiarity, and then also kind of the emphasis that she put on guilty versus not guilty . . . . also left the United States uncomfortable with her ability to draw that line expressly where Your Honor placed it with the jury instructions.

(<u>Id.</u> at 290.)

Tomlinson argues that the record reflects that the Government's asserted justifications do not "speak to her credibility," and therefore indicate that the Government's asserted justifications were pretextual. (ECF No. 99 at 22.) The Government declined to brief the strike of [Juror #37] because it argues that the Court already denied the <u>Batson</u> challenge as to [Juror #37] and Tomlinson did not appeal the Court's finding. (ECF No. 92 at 14–15.)

Regardless of whether Tomlinson's reassertion of his challenge as to [Juror #37] is properly before the Court, the Court finds no <u>Batson</u> violation as to [Juror #37].  As the Court noted on the day of voir dire, [Juror #37] showed "a lot of familiarity with [Tomlinson]" in a way that seemed "flippant and less than serious."  (ECF No. 75 at 295.)  The Court further noted that [Juror #37]'s comments and conduct were very unusual.  (<u>Id.</u> at 296.)  As a result, the Court found that the juror's apparent "level of willingness . . . to ingratiate herself with the defendant, that is apologize and be solicitous . . . would cause someone concern."  (<u>Id.</u> at 297.)  Consequently, the Court found no <u>Batson</u> violation.  Even in light of the pattern of strikes and Tomlinson's renewed objection, the Court still finds the Government's justification for striking [Juror #37] credible.  Accordingly, Tomlinson has not met his burden to establish invidious discrimination as to the strike of [Juror #37].

## IV.  CONCLUSION

For the reasons stated above, Defendant Christopher Tomlinson's motion to vacate his conviction is DENIED.

**IT IS SO ORDERED,** this 1st day of July, 2015.


                                   /s/ Jon P. McCalla
                                   JON P. McCALLA
                                   UNITED STATES DISTRICT JUDGE